IN THE UNITED STATES DISTRICT COURT

NORTHEN DISTRICT OF TEXAS

DALLAS DIVISION



UNITED STATES OF AMERICA

v.   No. 320CR000546-003

SERGIO ANTONIO PENA CORTES

### DEFENDANDT'S PRO SE MOTION FOR EARLY TERMINATION OF SUPERVISED RELEASE
### PURSUANT TO TITLE 18 U.S.C. §3583(e)(1)

#### I. INTRODUCTION

Defendant Sergio Antonio Pena Cortes, proceeding pro se, it is with utmost respect that he earnestly petitions this Honorable Court to consider the termination of his supervised release, in accordance with Rule 32.1 (c) of the Federal Rules of Criminal Procedure and 18 U.S.C. §3583(e)(1). Mr. Pena commenced his two-year term of supervised release on August 5, 2022. As of this moment, he has diligently fulfilled approximately 14 of the 24 prescribed months, constituting a substantial fifty-eight percent of the mandated supervised release term served.

#### II. APPLICABLE LAW

Title 18, Section 3583(e)(1) of the United States Code grants the Court the authority to terminate a defendant's term of supervised release at any time after one year of supervision if the Court determines that such action is justified by the defendant's conduct and serves the interests of justice. No hearing is requested for this petition. Section 3583(e) instructs the Court to take into account the sentencing purposes outlined in 18 U.S.C. § 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) when deciding whether to terminate a term of supervised release.

The Judicial Conference has identified specific criteria for assessing eligibility for early termination. Officers are advised to consider the suitability of early termination for offenders as soon as they become statutorily eligible. The general criteria for recommending early termination to the court for statutorily eligible offenders are as follows:

1. Demonstrated stable community reintegration, including factors such as residence, family, and employment stability.

2. Consistent progress towards meeting supervision objectives and strict compliance with all conditions of supervision.

3. Lack of an aggravated role in the offense of conviction, especially in cases involving large-scale drug or fraud offenses.

4. Absence of a history of violence, including sexually assaultive, predatory behavior, or domestic violence.

5. No recent arrests or convictions (including unresolved pending charges) or ongoing patterns of criminal conduct.

6. No recent evidence of alcohol or drug abuse.

7. No recent psychiatric episodes.

8. No identifiable risk to the safety of any identifiable victim.

9. No identifiable risk to public safety based on the Risk Prediction Index (RPI).

According to the Guide to Judiciary Policy, Vol. 8E, Ch. 3 § 380.10(b), 'Early Termination' (Monograph 109) (revised in 2010), there is a presumption in favor of recommending early termination for supervisees after the first 18 months, While Mr. Pena has not yet reached the 18-month mark of his 24-month imposed supervision, his substantial completion of fifty-eight percent of the mandated supervised release term served is a testament to his commitment and progress in reintegrating into the community successfully. Moreover, as Mr. Pena does not fall into the categories of 'career violent and/or drug offenders, sex offenders, or terrorists,' and there is no identified risk to the public or victims, and he has maintained a record free from moderate or high severity violations, these facts align with the guideline's recommendations. This further underscores the appropriateness of considering early termination in Mr. Pena's case.

Furthermore, on February 16, 2012, the Honorable Robert Holmes Bell, Chair of the Committee on Criminal Law of the Judicial Conference, issued a memorandum to all United States District Court Judges encouraging them to grant early termination of supervised release in appropriate cases as a measure to reduce expenditures in the probation and pretrial services programs. Terminating 'appropriate cases before they reach their full term saves resources and allows officers to focus on offenders who continue to pose the greatest risk of recidivism.' Judge Bell's memorandum notes that supervision costs approximately $3,938 per year per case. Analysis by the Administrative Office of the Courts indicates that offenders who received early termination were 'arrested less often, for less serious charges, and were sentenced to terms of imprisonment less often.' Consequently, '[f]rom a policy standpoint, it appears that the above criteria, when properly applied, do not jeopardize public safety.

### III. MR. PENA SATISFIES ALL THE CRITERIA FOR EARLY TERMINATION

Mr. Pena unequivocally meets all the criteria for early termination. He has consistently adhered to every term of his supervision and has no requirement for programming or treatment. Furthermore, he has dutifully fulfilled his financial obligations by making full payments towards his fines. His performance aligns favorably with each individual point included in the general criteria for recommending early termination.

#### 1. Stable Community Reintegration:

- Mr. Pena has maintained ownership of his residence for the past three years, underscoring the importance of stable housing in community reintegration. Notably, he has never missed a mortgage payment, further highlighting his commitment to maintaining a stable and responsible living situation.

- Mr. Pena has received valuable support from his community. His neighbors have shown exceptional support during his absence, assisting with tasks like lawn maintenance and reducing his financial burden. This unwavering community support demonstrates his positive integration into his neighborhood and emphasizes his strong ties within the community.

- Mr. Pena's family provided unwavering support during his pretrial detention, with ten family members traveling from different cities and states to be by his side in Dallas, TX. Their ongoing support remains a critical element of his community reintegration.

Attached to this motion are handwritten copies of letters of support from his family, including his wife, Denise, and his mother, Carmenza, representing his maternal relatives. These letters express their perspective and heartfelt sentiments. Translations are provided for his mother's letters, considering her limited proficiency in English.

#### 2. Employment Stability:

- Since his release on August 5, 2022, Mr. Pena has been self-employed as a food delivery driver through apps like DoorDash and UberEATS. Although exact hours are not recorded, his earnings indicate a substantial income for an individual recently released. Notably, he earned at least $5,750.10 in 2022 and $13,799.74 in the first seven months of 2023. This translates to an approximate weekly income of $375 or around $10 per hour (assuming a 40-hour workweek).

- Mr. Pena also held positions at CellTouch and Elite Wireless during specific periods, which further underscores his commitment to stable employment. These positions were a direct result of his extensive experience in retail sales and customer service, highlighting his valuable skills and adaptability in the job market.

- In total, he has earned approximately $30,000 between August 2022 and August 2023, indicating successful integration into the job market and his role as a productive member of society.

### 3. Exemplary Compliance with Supervision Conditions and Financial Responsibility:

- Mr. Pena has demonstrated unwavering commitment to compliance with all conditions of supervision, including regular reporting and diligent adherence to requirements that arise from unforeseen events.

- Additionally, his family proactively secured a loan from the private market to fully pay the fines imposed by the court, reflecting their utmost dedication to fulfilling all financial obligations associated with his case.

### 4. Minor Role in Offense:

- Court documents clearly demonstrate Mr. Pena's minor role in the offense, with clear evidence that he acted under the direct instructions of another individual who exploited their position.

### 5. No History of Violence or Criminal Conduct:

- Mr. Pena has no history of violence, arrests, convictions, unresolved pending charges, or any criminal conduct.

### 6. Abstinence from Substance Abuse:

- Mr. Pena does not use drugs or engage in excessive alcohol consumption. He has been tested twice with negative results, and there is no history of substance abuse.

### 7. Mental Health Stability:

- He does not suffer from any psychological or psychiatric conditions, nor has he exhibited any signs of such conditions.

### 8. Lack of Capability for Offense:

- As previously mentioned, Mr. Pena lacks the knowledge and skills related to the offense and acted solely upon specific instructions from an individual he no longer has contact with, eliminating any threat to identifiable victims.

### 9. Low Risk Assessment:

- A Post Conviction Risk Assessment test suggests that Mr. Pena poses a low risk to the public and society in general. His criminal history is limited to this single event.

- He possesses an education and has secured stable employment, with outstanding job opportunities on the horizon.

- Mr. Pena maintains positive social connections and leads a stable life.

### IV. Professional aspirations.

An important factor to consider in Mr. Pena's early termination request is its impact on his career aspirations. As previously discussed with the pretrial officer, the court, and the U.S. probation officer, Mr. Pena holds the following certifications:

- FAA Flight Attendant certificate issued under 14 CFR Part 121.

- FAA Commercial Pilot License issued under 14 CFR Part 61.

Additionally, he has met the requirements of 14 CFR Part 61.213 to become certified as an Advanced/Instrument Ground Instructor, a certification enabling him to teach aviation at a professional level. Currently, he is in the process of training to become a certified Flight Instructor under 14 CFR 61.183, further enabling him to instruct aspiring student pilots in actual flight.

Mr. Pena does indeed have limited experience in the roles that he is currently eligible for. However, it's essential to emphasize that every aspiring professional pilot faces similar challenges. These conditions are inherent to the aviation industry and are not unique to Mr. Pena. Importantly, they are in no way connected to the circumstances of his case. This can be evidenced by the ongoing shortage of pilots in the United States, which is a systemic issue within the aviation industry.

At this point in his career, Mr. Pena does not bear any extra burden in terms of prospective employment opportunities compared to other pilots who are at a similar stage in their careers. The challenges he encounters are solely related to the standard conditions of supervised release, with a primary focus on the restriction that confines him to the Middle District of Florida. This geographical limitation presents a substantial barrier to the pursuit of his aviation career aspirations.

Nevertheless, it's important to underscore that the standard conditions of supervised release do not align with the nature of Mr. Pena's chosen career path. Several key considerations come into play in this regard:

1. Insurance Costs for Low-Time Pilots:

Mr. Pena falls into the category of "low-time" pilots, which results in higher insurance costs due to limited flight experience. This situation applies to any air operator seeking insurance coverage for a pilot with his level of experience.

2. Stringent U.S. Pilot Experience Requirements:

In response to the Colgan Air Flight 3407 accident, the United States implemented significantly increased minimum requirements for pilots in passenger air carrier operations during the Obama administration. This means that the U.S. now mandates significantly more flight experience for pilots compared to European countries with similarly high safety standards.

Low-time pilots like Mr. Pena have limited opportunities to gain the necessary flight experience to progress in their careers.

*Potential Career Paths:*

Given these challenges, three potential paths forward are under consideration:

1. Exploring Opportunities Abroad:

Exploring opportunities abroad is one potential avenue. There are indeed certain countries that permit American pilots to gain experience, but it's crucial to acknowledge that this option is generally considered a last resort due to its impracticality for most individuals. The challenges associated with relocating to a foreign country, navigating potential regulatory differences, and adapting to a new environment make this choice a less favorable option for most aspiring pilots.

2. Specialized Roles in Remote Areas:

Another alternative worth considering is pursuing specialized roles in remote areas of the United States. These positions frequently entail flying "easy-to-insure" aircraft and are often staffed by low-time pilots. Examples of such roles include becoming a bush pilot in Alaska or engaging in pipeline patrol operations in New Mexico. While these positions can indeed offer valuable experience, it's important to note that they may not provide a significant increase in income, with average salaries typically hovering around $35,000. These roles are typically more appealing to younger pilots with lower living expenses.

Mr. Pena has explored this alternative, and while it is not entirely ruled out, it remains impractical primarily due to the constraints of supervised release.

3. Becoming a Certified Flight Instructor:

An alternative and highly promising pathway for low-time pilots like Mr. Pena is to pursue further certification as a Flight Instructor. Currently, Mr. Pena is diligently studying the theory of instruction, which primarily revolves around understanding how individuals learn, based on a theory known as "fundamentals of instruction." Given that this aspect of his career primarily involves theoretical work, the timeline for completing his certification could be a matter of weeks.

Significantly, Mr. Pena has received a verbal job offer from a Flight School, contingent upon him obtaining the Flight Instructor certificate. This aligns perfectly with the traditional practice of flight

schools, which often prefer to hire individuals who have earned their certificates within their specific training programs.

This option stands out as the most suitable one for Mr. Pena, especially considering the potential income it offers, averaging around $60,000 annually for certified Flight Instructors. Moreover, unlike limited opportunities for low-time pilots in aerial operations, flight schools are widespread, with locations at or near virtually every airport across the United States. This extensive network of flight schools ensures a more accessible path to employment and career advancement within the aviation industry.

*Supervised Release Challenges:*

However, it is crucial to underscore that the conditions of supervision present a unique and challenging dilemma in this scenario. For example, if a student aspires to earn a Private Pilot certificate under the requirements of 14 CFR 61.109, they are obligated to complete "One cross-country flight of over 100 nautical miles total distance." Similarly, for a student aiming to obtain a Commercial Pilot Certificate under the requirements of 14 CFR 61.129, they are obligated to complete "one 2-hour cross-country flight...distance of more than 100 nautical miles from the original point of departure."

While Mr. Pena may potentially provide this training within the boundaries of the Middle District of Florida, traditional flight school policies may dictate that cross-country flights must be conducted to airports where the school has established facilities. This could result in flights extending outside the geographical limits of the district. Furthermore, there is an ongoing debate within the aviation community regarding the interpretation of the clause "from the original point of departure." Some FAA Designated Pilot Examiners interpret it as referring to the location of the aircraft's home base, while others interpret it as simply indicating where the flight begins, irrespective of whether the aircraft has been repositioned previously.

This ambiguity places Mr. Pena at a distinct disadvantage. Even if he can secure employment and design flight plans that meet the aeronautical experience requirements within the Middle District of Florida, there remains a significant risk of encountering an FAA Designated Pilot Examiner who adheres to the school of thought that the interpretation of the clause requires the aircraft not to be repositioned. In such a scenario, training efforts could fail, raising questions and concerns that could potentially damage his professional reputation and jeopardize his career prospects. This is an undesirable situation that might lead to significant setbacks in his aviation career.

Moreover, various factors such as weather deviations, maintenance requirements, and customer service considerations can influence flight training. Some flight schools permit students to choose their destinations, and cultural factors can also play a role in flight training. For example, there is an online challenge among student pilots that encourages them to land at all Florida airports during their training. From an instructional perspective, this challenge is entirely valid. In fact, theory suggests that learning is a product of motivation, and such motivations align with the "esteem" category of needs according to the renowned psychologist Abraham Maslow.

*Impact on Employment Options:*

Notably, the restrictions imposed by supervised release not only limit Mr. Pena's employment options within the district but also hinder his ability to secure employment elsewhere. For instance, South Florida represents an incredibly attractive market for flight instructors and students alike. However, the conditions of supervision effectively rule out the possibility of employment with commuting options.

In the aviation industry, it's a common practice for pilots and flight attendants not to reside in the same location where they work. The market caters to this need by offering specialized "crashpads" that are exclusively designed for industry professionals. These "crashpads" provide housing in proximity to airports, often at higher quality standards and more affordable rates.

This commuting approach could present a practical and viable opportunity for Mr. Pena, aligning perfectly with his desire for employment and career advancement. For instance, a job offers in South Florida that involves commuting back and forth between his home in central Florida and the workplace in South Florida remains financially and professionally feasible for him. However, it's important to note that such arrangements are not effectively supported by the conditions of supervision that currently restrict its movement and geographic range. This limitation poses a significant challenge to his ability to explore employment options in areas where aviation opportunities are abundant.

Furthermore, other aviation hotspots across the country, such as Mesa, AZ, where Mr. Pena happens to have family, could present potential opportunities. He can count on his aunt and uncle for a place to stay until he can establish himself in the area. However, the conditions of supervision create insurmountable obstacles in this scenario. While Mr. Pena has no issue requesting a place to stay, it would be highly inconsiderate to involve a local probation officer in his personal affairs simply because he is a guest with the additional burden of supervised release. These limitations severely impact his ability to explore employment options in areas where aviation opportunities abound.

*Complexities in the Aviation Industry*:

These considerations underscore the complexities and practical challenges that may arise within the aviation industry and the unique circumstances Mr. Pena faces as a low-time pilot aiming to further his career through flight instruction. Furthermore, they highlight the significant impact that continued supervised release could have on his ability to pursue his chosen career and the unique challenges that low-time pilots face in the industry.

It is essential to emphasize that disclosing Mr. Pena's supervision status is not a viable option. While there are no explicit legal restrictions preventing the hiring of individuals in Mr. Pena's condition, the absence of a clear regulatory framework in this regard can lead to uncertainties. Employers may opt for a defensive approach and choose to deny employment, even when there are no explicit prohibitions. This dilemma is not as pronounced at the airline level because the issue of background checks is specifically addressed in 49 CFR, which provides a clear framework and limits a company's liability to compliance with these regulations.

The Regulatory Wait Period:

Most crucially, Mr. Pena faces a pressing challenge. In the aviation industry, the keys to success and fulfillment primarily revolve around seniority. Considering the legal retirement age set at 65, Mr. Pena's current age stands at 31. However, there exists an 8 ½-year waiting period before he can rejoin passenger airline operations. This lengthy interval is a direct consequence of 49 CFR 1544.229, which necessitates a 10-year background check period before regaining eligibility for such roles.

It's important to note that the purpose behind this regulation is to afford individuals in Mr. Pena's situation the opportunity to undergo training and maintain proficiency during this interim period. This preparation allows them to secure employment when they become eligible once again.

Being merely eligible will not suffice to secure a position; it is the depth of experience and a track record of excellence that truly matter. During typical airline interviews, background checks, and scrutiny of legal requirements, only the previous 10 years typically come under scrutiny, making it unlikely for Mr. Pena's period of supervision to be a focal point. However, should this incident ever surface, his best strategy is to showcase continuous professional development.

The timing aligns perfectly with Mr. Pena's expected experience requirements, allowing him the ideal window to build the necessary depth of expertise and career track record.

Considering Mr. Pena's exemplary reintegration into the community, his unwavering commitment to fulfilling the conditions of supervised release, and the unique challenges he faces in pursuing his career aspirations, he respectfully requests that the Court exercise its discretion and grant his motion to terminate his term of supervision under 18 U.S.C. § 3583(e). Your Honor, Mr. Pena's dedication to becoming a productive member of society is evident, and the termination of his supervised release will not only serve the interests of justice but also enable him to pursue his chosen career path unburdened by the limitations of supervision. We kindly urge the Court to consider all the compelling factors presented today and grant Mr. Pena the opportunity to continue his positive contributions to society.

To honorable Judge:

Your honor I want to bring to your attention something that's close to my heart - my husband, Sergio A Pena Cortes, and the request he has brought before your court.

I picked Sergio up from Coleman over a year ago, and I've been a witness to his unwavering determination to put this terrible chapter behind him.

He has not wasted any time since the day of his return to home. Despite getting a job that didn't quite satisfy either of us, Sergio was motivated to prove not only to his supervising officer but, most importantly, to himself that he could secure employment. He embarked on a daily commute that lasted an hour and a half - a testament to his commitment. Eventually, he found a job closer to home but simultaneously working double shifts doing food delivery gigs on the side. His goal was crystal clear: to create more time for aviation, a potentially profitable passion that burns brightly within him.

Your Honor, Sergio's passion extends beyond his own aspirations. Last winter, I had the opportunity to become a Flight Attendant for a major airline. I had my doubts, but Sergio encouraged me to attend the interview. We prepared diligently and professionally, even though we only had days to prepare but, with Sergio offering his invaluable knowledge and thanks to his guidance, I succeeded where others, who might have seemed better suited, failed. His dedication, orienting his training to my needs, boosting my strengths, and addressing my weaknesses, made possible for me to become a Crewmember.

Sergio still has a journey ahead before he can return to his dream job. But he hasn't stopped. He lives that dream through me. It couldn't have been easy for him to step back onto an airplane, knowing that for now, he has to stay away from the cockpit. Yet, he did it for me, even before considering his own feelings. Now, he's back on track. His flying and teaching skills have improved significantly, enough to make a living from them and some of his friends and myself are looking forward to become his first students. I know he feels like a caged lion, ready to leap forward and soar, both literally and metaphorically.

So, from the depth of my heart, I kindly implore you to consider approving his request. Sergio deserves this opportunity from you, and I believe in his potential to achieve great things in his career and life.

I thank you for your time and consideration.

Denis Silva

To the Honorable Judge:

My name is Carmenza Cortes, and I reside in the city of Atlanta, Georgia. I am the mother of Sergio Pena, who regained his freedom in August 2022, after serving a sentence of 1 year and 8 months.

I want to address you to express my request on behalf of Sergio. Since his release, he has been under custody, and this is the reason for my letter. I earnestly request that you consider Sergio's good behavior, as he has rigorously complied with all legal requirements, obeying and following everything stipulated by his custodian. I request that he be granted freedom from this custody.

For him, continuing his studies and advancing in his life is essential, and this requires the possibility of relocating to another city, as unfortunately, his current place of residence is a small town. The courses he needs to take are in another city. Additionally, we wish to continue having Sergio in our lives, as he is a vital person in our family.

Sincerely,

CARMENZA CORTES

PARA LA
   HONORABLE SEÑORA JUEZ

MI NOMBRE ES CARMENZA CORTES Y RESIDO EN LA CIUDAD DE ATLANTA GA.

SOY MADRE DE SERGIO PEÑA QUIEN OBTUVO SU LIBERTAD EN AGOSTO DE 2022 DESPUES DE 1 AÑO Y 8 MESES DE CUMPLIR UNA SENTENCIA. AL RECOBRAR SU LIBERTAD QUEDO CON UNA CUSTODIA Y ESTA ES LA RAZON DE MI CARTA PIDO A USTED QUE SE LE TENGA EN CUENTA A SERGIO SU BUEN COMPORTAMIENTO YA QUE EL HA SEGUIDO AL PIE DE LA LETRA TODO LO REQUERIDO POR LA LEY, OBEDECIENDO Y ACATANDO TODO LO DISPUESTO POR SU CUSTODIO, Y LE OTORGUE LA LIBERTAD DE DICHA CUSTODIA.

RECEIVED
SEP 2 9 2023
KAF
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

PUES PARA CONTINUAR CON SUS ESTUDIOS Y SUPERARSE MAS ES NECESARIO PARA EL PODERSE MOVILIZAR A OTRA CIUDAD, PUES INFORTUNADAMENTE SU LUGAR DE RESIDENCIA ES UNA CIUDAD PEQUEÑA Y LOS CURSOS QUE NECESITA HACER ESTAN DISPONIBLES EN OTRA CIUDAD.

TAMBIEN A NUESTRA FAMILIA Y A MI NOS GUSTARIA SEGUIR CONTANDO CON SU PRESENCIA, YA QUE EL ES UNA PERSONA VITAL EN NUESTRA FAMILIA.

ATTE. Carmenza Cortes

Valeria Pena-Cortes
7689 Creekside lane
Riverdale GA, 30296

To The Honorable Judge

I am writing this character letter on behalf of my brother Sergio Pena-Cortes. My name is Valeria Pena-Cortes and I am registered nurse in the state of Georgia.

My brother Sergio is currently on probation after serving a sentence of one year and eight months. I am writing this letter to request that his probation period ends early as Sergio would like to continue his education and to do so he needs to be able to travel to a different city that offers the courses he would like to take. Additionally, we would like to be able to see Sergio more often, especially because I have an eleven month old son whom I would like for Sergio to be close to and be an active role model in his life.

RECEIVED
SEP 29 2023
KAF
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

I ask that you please take into account Sergio's good behavior throughout his sentence as well as during the time he has been on probation when making your decision.

